UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER NINA MORUZZI, | ) | CASE NO. 4:17CV287 |
| | ) | |
| | ) | JUDGE JAMES S. GWIN |
| Plaintiff, | ) | |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| NANCY BERRYHILL[1], | ) | |
| COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Jennifer Nina Moruzzi ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her application for supplemental security income ("SSI"). ECF Dkt. #1. In her brief on the merits, filed on June 7, 2017, Plaintiff asserts that the administrative law judge ("ALJ") failed to properly weigh treating physician opinions and determine her residual functional capacity ("RFC") and he failed to properly evaluate her credibility. ECF Dkt. #9. On July 7, 2017, Defendant filed a brief on the merits. ECF Dkt. #10. Plaintiff did not file a reply brief.

For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.

## I.     FACTUAL AND PROCEDURAL HISTORY

On May 30, 2013, Plaintiff filed an application for SSI alleging disability beginning February 1, 2012, due to "can't stand people, mental break down, back pain, cyst in kidney, anxiety, and depression." ECF Dkt. #8 at 158, 182.[2] Plaintiff's application was denied initially and upon reconsideration. *Id.* at 64-104. Following the denial of her application, Plaintiff requested an

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the transcript refer to the page numbers assigned when the transcript was filed in the CM/ECF system rather than the page numbers assigned when the transcript was compiled. This allows the Court and the parties to easily reference the transcript as the page numbers of the .PDF file containing the transcript correspond to the page numbers assigned when the transcript was filed in the CM/ECF system.

administrative hearing, and on August 6, 2015, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id.* at 33, 109.  On August 27, 2015, the ALJ issued a decision denying Plaintiff's application for SSI. *Id.* at 13-32.  Plaintiff requested a review of the hearing decision, and on January 16, 2016, the Appeals Council denied review.  *Id.* at 5-12.

On February 10, 2017, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1.  Plaintiff filed a brief on the merits on June 7, 2017.  ECF Dkt. #9.  On July 7, 2017, Defendant filed a merits brief.  ECF Dkt. #10.  Plaintiff did not file a reply brief.

## II.    ALJ'S DECISION

In his decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 22, 2013, her alleged onset date.  ECF Dkt. #8 at 20.

The ALJ found that Plaintiff had the severe impairments of lumbar spine degenerative disc disease ("DDD"); a history of chronic renal failure; status post thyroidectomy; affective disorders; and anxiety disorders.  ECF Dkt. #8 at 18.  He further found that these impairments, individually or in combination, did not meet or equal any of the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *Id.* at 18-20.  The ALJ thereafter determined that Plaintiff had the RFC to perform light work with the following limitations: a sit/stand option allowing the person to briefly, for one to two minutes, alternate sitting or standing positions at thirty-minute intervals without going off task; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching and crawling; never climbing ladders, ropes or scaffolds; avoidance of concentrated exposure to extreme cold and heat, wetness and humidity; avoidance of all exposure to unprotected heights, hazardous machinery, and commercial driving; simple, routine, and repetitive tasks, requiring only simple decisions and free of fast-paced production requirements with few workplace changes; and no more than occasional interaction with the public, co-workers, and supervisors.  *Id.* at 20-21.

The ALJ addressed Plaintiff's physical impairments and mental impairments in his decision, including Plaintiff's back pain and her psychiatric conditions.  ECF Dkt. #8 at 19-26.  He reviewed the opinions of Dr. Shivers, Plaintiff's treating physician, and Dr. Kaza, Plaintiff's treating

-2-

psychiatrist.  *Id*. at 25-26.  He attributed "little weight" to Dr. Shivers' opinions and "no great weight" to the opinion of Dr. Kaza.  *Id*. He also attributed "little weight" to the opinions of the state agency consulting physicians.  *Id*. at 26.

The ALJ went on to find that based upon the RFC that he determined for Plaintiff and the VE's testimony, Plaintiff could perform jobs existing in significant numbers in the national economy, such as the jobs of mail clerk, office assistant, or bench assembler.  ECF Dkt. #8 at 26-27. The ALJ therefore found that Plaintiff was not under a disability as defined in the Social Security Act from May 22, 2013 through the date of his decision.  *Id*. at 27.

### III. <u>STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS</u>

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**IV.**    **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

**V.**    **RELEVANT MEDICAL EVIDENCE**

**A.**    **Relevant Physical Impairment Evidence**

Plaintiff presented to Salem Community Hospital for a lumbar x-ray on April 4, 2012 for complaints of low back pain for three years with numbness and tingling in the left hip. ECF Dkt. #8- at 259. The x-rays showed anterolisthesis of L4 upon L5 thought to be degenerative, but normal vertebral body height and preserved disc heights, and bilateral facet hypertrophic and sclerosis at the L5-S1 levels. *Id.*

Plaintiff presented to Salem Community Hospital for a lumbar MRI on May 25, 2012. ECF Dkt. #8 at 256. The MRI showed: a tiny right paracentral disc extrusion at L1-L2 with no significant neural foraminal narrowing or central canal stenosis; mild to moderate facet hypertrophic degenerative changes at L4-L5 with mild broad-based disc bulge; mild bilateral foraminal narrowing with mild central canal stenosis; mild to moderate facet hypertrophic degenerative changes at L5-S1 with minimal broad-based disc bulge, mild bilateral neural foraminal narrowing and no significant central canal stenosis; and two 1.5 cm simple cysts in the lateral aspect of the left kidney. ECF Dkt. #8 at 256. Final impressions were DDD and facet degenerative changes of the lumbar spine and two simple cysts in the left kidney. *Id.* at 257.

A July 24, 2013 letter from Dr. Black at Northeastern Ohio Urological Surgeons, Inc. reported that while Plaintiff's renal ultrasound showed a couple of small cysts, he did not believe that they would cause a problem and he indicated that he would follow up with her in one year for a CT scan. ECF Dkt. #8 at 362.

On August 22, 2013, Dr. Sethi, an examining agency physician, examined Plaintiff for her knee and back pain and her anxiety. ECF Dkt. #8 at 273. He noted her history of back pain for several years that was spreading to the tailbone and her complaints that she could not squat and had trouble climbing stairs. *Id.* Plaintiff also reported that she had experienced anxiety for some time and some family situations had affected her. *Id.* She reported going to counseling in the past. *Id.*

Dr. Sethi's physical examination revealed that Plaintiff's lower extremities showed no edema, cyanosis or clubbing, normal arterial pulse, and normal range of motion in the joints, without effusion, redness or deformity. ECF Dkt. #8 at 274. He reported that Plaintiff was able to walk on her tiptoes and heels and she could squat, she was not using any ambulatory aids, and she had a normal gait. *Id.* Dr. Sethi noted that Plaintiff had no swelling, redness or deformity in her cervical or thoracic spine and had normal ranges of motion. *Id.* at 275. He indicated that Plaintiff's lumbar spine had mild tenderness in the midline at L4-5 and S1, but no muscle spasm or guarding, with somewhat limited flexion and negative straight-leg raising. *Id.*

His impressions were that Plaintiff had a history of back and knee pain, a history of anxiety and depression, and a remote history of alcoholism. ECF Dkt. #8 at 275. He opined that Plaintiff's

abilities to perform work-related physical activities such as sitting, standing, walking, lifting, carrying and handling objects were normal. *Id.*

Plaintiff presented to Dr. Shivers, M.D. on July 14, 2014 as a new patient. ECF Dkt. #8 at 367. She reported her history of anxiety and chronic back pain, thyroid dysfunction and right thumb numbness. *Id.* Physical examination showed some tenderness to palpation of the right thumb. *Id.* Dr. Shivers diagnosed anxiety, chronic lumbar pain, rule out neurapraxia of the right thumb, and weight gain. *Id.* He ordered a mammogram and referred Plaintiff for a colonoscopy and to pain management. *Id.*

On October 20, 2014, Dr. Shivers completed a questionnaire in which he reported that Plaintiff just started seeing him in July of 2014. ECF Dkt. #8 at 372. He listed his diagnoses for her as anxiety, chronic lumbar pain and thyroid dysfunction. *Id.* at 368. He indicated that Plaintiff was not a malingerer and her symptoms were chronic back pain and anxiety and her back pain was moderate to severe pain on a daily basis. *Id.* at 369. He opined that Plaintiff could sit and stand/walk for up to 2 hours each per 8-hour workday and she had to avoid continuous sitting and needed to get up and move around every 2 hours for 10 to 20 minutes at a time. *Id.* at 370. He further opined that Plaintiff could lift and carry 0-10 pounds occasionally and could never lift and carry more than that. *Id.* He opined that Plaintiff was moderately limited in using her left hand and arm to grasp and twist objects, in performing fine manipulations and in using her left arm to reach, and she was markedly limited in performing these activities with her right hand and arm. *Id.* at 371. He opined that Plaintiff would frequently experience pain, fatigue, and other symptoms severe enough to interfere with her attention and concentration and Plaintiff's symptoms would increase if she were placed in a competitive work environment and she would experience more pain. *Id.* Dr. Shivers further opined that Plaintiff needed to take unscheduled breaks to rest at unpredictable intervals during the workday every 1 to 2 hours for an average of 10 to 20 minutes each time. *Id.* Finally, Dr. Shivers opined that Plaintiff would miss work more than 3 times per month due to her impairments or treatment and her anxiety contributed to the severity of her symptoms and functional limitations. *Id.* at 372. He noted that Plaintiff's symptoms and limitations began in February of 2011. *Id.*

Progress notes dated April 20, 2015 from Dr. Shivers indicated that Plaintiff presented for a disability examination. ECF Dkt. #8 at 383. Dr. Shivers noted that Plaintiff was having significant problems with depression, she was extremely tired, had no energy, and she did not want to do any daily activities. *Id*. Physical examination was normal and Dr. Shivers diagnosed hypothyroidism and depression. *Id*. Dr. Shivers opined that Plaintiff "has problems with chronic depression and at this time she is unable to do full-time competitive work." *Id*. He indicated that he would call Dr. Kaza for further treatment for Plaintiff's depression and Plaintiff should follow up with him in three months. *Id.*

On May 11, 2015, Dr. Shivers completed a questionnaire in which he reported that Plaintiff just started seeing him in July of 2014 and he saw her on that date, as well as on March 17, 2015 and April 20, 2015. ECF Dkt. #8 at 393. He listed his diagnoses as anxiety, chronic lumbar pain and thyroid dysfunction. *Id*. at 389. He indicated that Plaintiff's symptoms were expected to last at least 12 months and she was not a malingerer. *Id*. He reported her symptoms as chronic back pain and anxiety and her back pain was moderate to severe on a daily basis. *Id*. at 390. He opined that Plaintiff could sit and stand/walk for up to 2 hours each per 8-hour workday and she had to avoid continuous sitting and needed to get up and move around every 2 hours for 10 to 20 minutes at a time. *Id*. at 391. He further opined that Plaintiff could lift and carry 0-10 pounds occasionally and could never lift and carry more than that. *Id*. He opined that Plaintiff was moderately limited in using her left hand and arm to grasp and twist objects, in performing fine manipulations and in using her left arm to reach, and she was markedly limited in performing these activities with her right hand and arm. *Id*. at 392. He opined that Plaintiff would frequently experience pain, fatigue, and other symptoms severe enough to interfere with her attention and concentration and Plaintiff's symptoms would increase if she was placed in a competitive work environment. *Id*. Dr. Shivers further opined that Plaintiff needed to take unscheduled breaks to rest at unpredictable intervals during the workday every 1 to 2 hours for an average of 10 to 20 minutes each time. *Id*. Finally, Dr. Shivers opined that Plaintiff would miss work more than 3 times per month due to her impairments or treatment and her anxiety contributed to the severity of her symptoms and functional limitations. *Id*. at 393. He noted that Plaintiff's symptoms and limitations began in February of 2011. *Id.*

-7-

On June 17, 2015, Dr. Shivers wrote a letter indicating that he had been treating Plaintiff every three months since July 14, 2014 for anxiety, chronic lumbar pain and thyroid dysfunction. ECF Dkt. #8 at 398.  He repeated the limitations that he set forth for Plaintiff in his disability questionnaires and he concluded that in his medical opinion, Plaintiff's symptoms and limitations began on February 1, 2011 and continued to the present.  *Id.*

### B.  Mental Impairment Evidence

On January 18, 2013, Plaintiff presented for an initial psychiatric evaluation for her one-year symptoms of depression, isolation, nightmares, poor sleep, easy frustration, racing thoughts, and post-traumatic stress disorder ("PTSD") from past sexual abuse. ECF Dkt. #8 at 301.  She reported past psychiatric history of four sessions of counseling. *Id.*  She identified her medications as Xanax, Prozac, Vistaril, Vicodin, and Novacain shots in her back.  *Id.*  Mental status examination showed that Plaintiff was well-groomed, mistrustful, withdrawn, avoidant, and she reported obsessional behavior, preoccupation, and auditory hallucinations. *Id.* at 302.  Her mood was noted as depressed, anxious, irritable, with a flat and labile affect, and impaired memory and concentration. *Id.* at 303. She was diagnosed with recurrent major depressive disorder with a rule out of psychosis. *Id.* at 303. Her global assessment of functioning score was 55, indicative of moderate symptoms. *Id.* It was noted that Plaintiff had been unemployed for the last 12 years and her daughter was 12 years old. *Id.* at 313.  She was diagnosed with anxiety, not otherwise specified, depression, not otherwise specified, and PTSD. *Id.* at 314.  She was referred for medication management and counseling. *Id.*

On February 1, 2013, Plaintiff presented to Dr. Kaza, her treating psychiatrist, for an evaluation and she indicated that she had no problems with her current medications. ECF Dkt. #8 at 333.  She reported that the medications have been helping and Dr. Kaza noted that Plaintiff's mood was calm, she was cooperative, and she had no suicidal ideations. *Id.* She indicated that she did not have time to think about depression because she was taking care of her mother, although she still had racing thoughts and anxiety. *Id.*  He decreased her Xanax dosage. *Id.*

Notes from February 22, 2013 indicate that Plaintiff reported that she had not had any anxiety attacks, her behavior was calm, and she had a flat affect. ECF Dkt. #8 at 332.  Plaintiff

indicated that Vistaril did not work for her but Prozac had improved her depression. *Id.* The Vistaril was discontinued, Xanax was continued, and Buspar was added. *Id*.

March 22, 2013 medication management notes indicated that Plaintiff had taken herself off of Xanax because it made her feel funny. ECF Dkt. #8 at 331. Plaintiff had a flat affect, she denied suicidal thoughts, and she was still experiencing anxiety. *Id.* She was anxious and apologetic as she indicated that she was very confused and was unable to remember her medications as to which she had discontinued and which she was to take. *Id*. The Xanax was discontinued, her Prozac was decreased, and she was continued on Buspar. *Id*.

Medication management notes dated April 19, 2013 indicated that Plaintiff had weaned herself off of Prozac and she reported that anxiety was new to her and she did not know how to deal with it. ECF Dkt. #8 at 329. She asked for medication to help her sleep and to control her anxiety. *Id.* Plaintiff had a flat affect, was tearful, and she had an increased anxious mood. *Id*. at 328. Dr. Kaza renewed Plaintiff's medications. *Id.* at 329.

Notes from May 17, 2013 show that Plaintiff had a flat affect, she denied suicidal thoughts, she was calm and she had reported that she had no panic attacks. ECF Dkt. #8 at 327. Her medications were refilled. *Id.*

June 14, 2013 progress notes indicated that Plaintiff complained that sometimes Buspar does not work for her and her mood was angry, anxious and agitated, although she indicated that her depression had improved. ECF Dkt. #8 at 325-326. Her medications were refilled. *Id*.

Notes from July 19, 2013 showed that Plaintiff had a flat, sad, depressed affect and she reported that her landlord was turning off her electricity and water and she had to find a new place to live. ECF Dkt. #8 at 324. She also indicated that she was receiving injections in her back and she was only taking Buspar. *Id*. Dr. Kaza assessed Plaintiff and adjusted her medications. *Id*.

On August 16, 2013, Dr. Kaza completed a medical statement indicating that he first treated Plaintiff on February 1, 2013 and most recently treated her on August 16, 2013. ECF Dkt. #8 at 265. He diagnosed her with depressive disorder and identified supportive clinical findings of appetite disturbance with weight change, sleep disturbance, mood disturbance, recurrent panic attacks, anhedonia or pervasive loss of interests, social withdrawal or isolation, decreased energy, feelings

of guilt/worthlessness, difficulty thinking or concentrating, and suicidal ideations. *Id.* at 265-266. He listed Plaintiff's primary symptom as depression and noted that Plaintiff's anxiety was the most frequent/severe. *Id*. at 267. Dr. Kaza indicated that Plaintiff had not required emergency room treatment or hospitalization for her symptoms. *Id.*

Dr. Kaza then completed the part of the form requesting that he rate Plaintiff's capacity to sustain specific activities over a normal workday and workweek on an ongoing basis in a competitive work environment. ECF Dkt. #8 at 267. He concluded that Plaintiff was mildly limited in maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; she was moderately limited in remembering locations and work-like procedures, understanding, remembering, and carrying out one or two-step instructions, working in coordination with others without being distracted by them, interacting appropriately with the general public, asking simple questions or requesting assistance, and in responding appropriately to changes in the work setting. *Id*. at 268-270. Dr. Kaza opined that Plaintiff was markedly limited in: understanding, remembering, and executing detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without supervision; making simple, work-related decisions; completing a normal workweek without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers without distracting them or exhibiting behavioral extremes; being aware of normal hazards and taking appropriate precautions; traveling to unfamiliar places or using public transportation; and setting realistic goals or making plans independently. *Id.* Dr. Kaza also opined that Plaintiff would experience episodes of deterioration or decompensation in work or work-like settings which would cause her to withdraw from the situation or exacerbate her symptoms. *Id*. at 270. He explained that Plaintiff felt nervous around people. *Id*. He further indicated that Plaintiff was not a malingerer, she was incapable of even low work stress, her impairment would likely produce "good" and "bad" days, and she would likely be absent from work due to impairments or treatment more than three times per month. *Id.* at 271.

-10-

Medication management notes from September 13, 2013 show that Plaintiff had a calm and cooperative affect and she reported that she had moved and felt safe in her new location. ECF Dkt. #8 at 320-321. Her mood was improved and she had no anxiety, but she reported that she was unsure of her current emotions. *Id*. at 320. Plaintiff's medications were refilled. *Id.* at 321.

October 11, 2013 notes showed that Plaintiff had an improved affect and mood, but it remained flat. ECF Dkt. #8 at 319. She discussed her past traumas. *Id*. at 318.

On May 23, 2014, Plaintiff requested counseling due to recent stressors and reported that she was successful with counseling in the past. ECF Dkt. #8 at 355. She reported increased anger and irritable behavior, disrupted sleep, low energy and increased worrying behavior. *Id*. She was referred for counseling. *Id*. at 357.

Plaintiff presented to Dr. Shivers on October 16, 2014 for breakthrough anxiety. ECF Dkt. #8 at 366, 386. She requested a refill of Valium. *Id*. He diagnosed her with anxiety and chronic lumbar pain and refilled her medications. *Id.*

Plaintiff presented to Dr. Shivers on March 17, 2015 complaining of breakthrough anxiety and depression. ECF Dkt. #8 at 384. He diagnosed her with anxiety/depression and planned on contacting Dr. Kaza concerning Plaintiff's continuing anxiety. *Id*.

Plaintiff returned to Dr. Kaza and counseling, reported that she wanted to be happy again. ECF Dkt. #8 at 376. April 17, 2015 notes indicated that Plaintiff reported that her paranoia and depression had improved slightly and her nightmares had improved. *Id*. at 377. Her medications included Trazodone for depression, Latuda for mood swings, Valium for nightmares, and Synthroid for her lack of a thyroid. *Id*. Plaintiff was well-groomed, had avoidant eye contact, was agitated, she had paranoia, and she was preoccupied and guarded. *Id.* at 378. Her mood was depressed, anxious and irritable, her affect was flat and labile, and she had good insight and judgment. *Id.* at 379. Plaintiff was diagnosed with major depressive disorder with psychotic features and she was prescribed Trazodone, Latuda and Valium. *Id*. at 380.

Progress notes dated April 20, 2015 from Dr. Shivers indicated that Plaintiff presented for a disability examination. ECF Dkt. #8 at 383. Dr. Shivers noted that Plaintiff was having significant problems with depression, she was extremely tired, had no energy, and did not want to do any daily

-11-

activities. *Id*. Dr. Shivers diagnosed hypothryoidism and depression and he opined that Plaintiff "has problems with chronic depression and at this time she is unable to do full-time competitive work." *Id*. He indicated that he would call Dr. Kaza for further treatment for Plaintiff's depression and Plaintiff should follow up with him in three months. *Id*.

On June 19, 2015, Dr. Kaza wrote a letter indicating that he had been treating Plaintiff since February 1, 2013 for her depressive disorder, which included clinical findings of appetite disturbance, sleep disturbance, mood disturbance, recurrent panic attacks, ahnedonia, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideations, social withdrawal or isolation, and decreased energy. ECF Dkt. #8 at 400. He opined that Plaintiff's symptoms and functional limitations were consistent with her emotional impairments. *Id*.

Dr. Kaza opined that Plaintiff was markedly limited in: understanding, remembering, and executing detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without supervision; making simple, work-related decisions; completing a normal workweek without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers without distracting them or exhibiting behavioral extremes; being aware of normal hazards and taking appropriate precautions; traveling to unfamiliar places or using public transportation; and setting realistic goals or making plans independently. ECF Dkt. #8 at 400. Dr. Kaza also opined that Plaintiff would experience episodes of deterioration or decompensation in work or work-like settings which would cause her to withdraw from the situation or exacerbate her symptoms. *Id*. He believed that Plaintiff's impairments were ongoing, creating the expectation that they would last at least 12 months. *Id*. He further indicated that Plaintiff was not a malingerer, she was incapable of even low work stress, her impairment would likely produce "good" and "bad" days, and she would likely be absent from work due to impairments or treatment more than three times per month. *Id*.

-12-

On June 28, 2016, Nurse Practitioner Sharma completed a disability impairment questionnaire and reported that Plaintiff began treatment in 2012 and was most recently examined on June 28, 2016. ECF Dkt. #8 at 462. She diagnosed Plaintiff with depressive disorder, PTSD, adjustment disorder with mixed anxiety and depression, generalized anxiety disorder, and panic attacks. *Id*. She opined that Plaintiff was not a malingerer and her impairments were expected to last at least 12 months. *Id.* She listed Plaintiff's primary symptoms as a bad mood, irritability, lack of energy and insomnia. *Id*. at 463. Plaintiff's medications were listed as Remeron, Valium and Hyrodoxyzine. *Id.* Nurse Practitioner Sharma opined that Plaintiff could sit and stand/walk at a job for up to three hours, but she could not sit continuously in an 8-hour workday. *Id*. at 464. She further opined that Plaintiff's symptoms would increase if she were placed in a competitive work environment as her anxiety and panic attacks would increase. *Id.* at 465. Nurse Practitioner Sharma opined that Plaintiff would occasionally experience pain, fatigue or other symptoms that would be severe enough to interfere with her attention and concentration, and she would need to take unscheduled, unpredictable breaks 1-2 times per day for 30 to 60 minutes for panic attacks. *Id.* at 464-465. She believed that Plaintiff would be absent from work more than 3 times per month due to her impairments or treatment and emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations based upon her depression and anxiety. *Id.* at 466. She opined that Plaintiff's symptoms and limitations began in 2010. *Id.*

## VI.  RELEVANT TESTIMONIAL EVIDENCE

Plaintiff testified at the time of the ALJ hearing that she was divorced and lived with her 14-year old daughter in an apartment with steps. ECF Dkt. #8 at 37-39. She reported that she had lost approximately 30 pounds in the last two years. *Id*. at 37. She leaves her house in order to go grocery shopping or to the doctor, but she does not drive even though she has a driver's license. *Id.* at 39. She testified that she does not drive because people drive like "idiots" and it angers her and makes her anxious. *Id*. at 55-56.

Petitioner testified that she became disabled on February 1, 2012 due to suffering a nervous breakdown. ECF Dkt. #8 at 42. She indicated that she had not worked since that time and not had

looked for a job.  *Id*.  Plaintiff reported that she had not looked for work at all since 2000 because she had to raise her daughter as she was the only one that her daughter has.  *Id*. at 42-43.

When asked to identify the conditions that she felt most interfered with her ability to work, Plaintiff identified her back condition.  ECF Dkt. #8 at 44.  She identified her last surgery on her thyroid the past year, and she indicated that she had a kidney surgery and a total hysterectomy. *Id*. at 44-45.  She reported that she has had no back surgeries, she never went to physical therapy for her back, and she took no narcotic pain medications for her back.  *Id*. at 45-46.  She used her cell phone to call her siblings and her mother, she performed household chores, prepared meals, used paper plates, washed some dishes by hand, did laundry and vacuumed her house with help from her daughter. *Id*. at 46-48.

Upon questioning from her attorney, Plaintiff described the mid-back pain that she suffers from constantly everyday.  ECF Dkt. #8 at 50.  She testified that the back pain is worse when she performs too much work at a time, walks up and down the stairs, or if she stands too long, like more than 25 or 30 minutes.  *Id*. at 50-51.  She estimated that she could sit for 5 to 15 minutes before she has to get up and move around.  *Id*. at 52.  She explained that she did not take narcotics for the pain because she preferred not to do so.  *Id*.  She said that she just lives with the pain, takes Tylenol, and she takes hot baths and showers to help with the pain.  *Id*. at 52-53.

Plaintiff also described her depression and anxiety, explaining that she does not want to leave her house and she becomes scared.  ECF Dkt. #8 at 53.  She also testified that she has racing thoughts and problems with her attention and concentration.  *Id*. She reported that she did not own a computer and explained that she had not used a computer in the last year because it was too frustrating for her.  *Id*. at 54.  She indicated that she read magazines and sometimes watched television, but she cannot follow along because of her racing thoughts.  *Id*.  She reported that she does not sleep well at night, averaging 4 hours each night, which causes her to feel unrested the next day and requires her to take naps.  *Id*. at 54-55.  They reviewed the housework that Plaintiff performs and Plaintiff reported that she could not perform many of the chores without her daughter's help.  *Id*. at 55-56.

The VE then testified. ECF Dkt. #8 at 57.  The ALJ asked the VE to assume a hypothetical person with the same age, education and work experience as Plaintiff who can perform light work with limitations of:  alternating between sitting and standing for up to two minutes at 30-minute intervals without going off-task; occasional posturals except no climbing of ladders, ropes, or scaffolds; avoiding concentrated exposure to extreme heat and cold and all exposure to unprotected heights, hazardous machinery and commercial driving; simple, routine and repetitive tasks requiring only simple decisions with no fast-paced production requirements and few workplace changes; no interaction with the public; and occasional interaction with co-workers and supervisors. *Id.* at 58-59. The VE responded that such a hypothetical person could perform the jobs of mail clerk, office assistant, and bench assembler.  *Id.* at 59.

The ALJ inquired about customary employer tolerances for being late to work, having unexcused or unscheduled absences, and the number of breaks and lengths of breaks per day, and the VE responded that typical employers would tolerate a day and a half per month of tardiness or absences and three breaks per workday, two 15-minute breaks and one 30-minute break for lunch. ECF Dkt. #8 at 59-60.  The VE also responded that typical employers would tolerate an employee being off task 10% of an 8-hour workday.  *Id.* at 60.

Plaintiff's counsel asked the VE about jobs available for a hypothetical person who has moderate limitations, which was defined as significantly affecting but not totally precluding the person's ability to perform the activities of understanding, remembering and executing one and two-step instructions for up to one-third of the workday.  ECF Dkt. #8 at 61.  The VE responded that no jobs would be available for such a hypothetical individual.  *Id.*  The VE had the same response when asked if a hypothetical person has at least moderate limitations in maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, and completing a normal workweek without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  *Id*.

-15-

The VE also stated that no jobs would be available for a hypothetical person who could sit only two hours of an 8-hour workday and stand/walk the same amount of time.  ECF Dkt. #8 at 62.

## VII.    LAW AND ANALYSIS

### A.    Law on Treating Physician Opinions[3]

An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  Social Security Rule ("SSR") 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied."  *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Id.*  If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record."  *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule."  *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010).  The Sixth Circuit has held that an ALJ's failure to identify the

---

[3]  The Court notes that the SSA has changed the treating physician rule effective March 27, 2017.  The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions.  Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules  and will consider the supportability and consistency factors as the most important factors.

reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ).  However, an ALJ need not discuss every piece of evidence in the administrative record so long as he considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

If an ALJ declines to give controlling weight to the opinion of a treating source, he must determine the weight to give that opinion based upon a number of regulatory factors. 20 C.F.R. § 404.1527(c)(2). Such factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson*, 378 F.3d at 544, citing 20 C.F.R. § 404.1527(c). An ALJ is not required to discuss every factor in 20 C.F.R. § 404.1527(c).

In addition, more weight is attributed to the opinions of examining medical sources than to the opinions of non-examining medical sources. *See* 20 C.F.R. § 416.927(d)(1). However, an ALJ can attribute significant weight to the opinions of a nonexamining state agency medical expert in some circumstances because nonexamining sources are viewed "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96–6p, 1996 WL 374180.  The regulations require that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. § 416.927(f)(2)(ii).  Moreover, an ALJ is not required to explain why he

favored one examining opinion over another as the "good reasons" rule requiring an ALJ to explain the weight afforded a treating physician's opinion does not apply. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006).

### 1.      Opinions of Dr. Shivers

Plaintiff's asserts that the ALJ violated the treating physician rule by failing to give good reasons for affording less than controlling and only "little weight" to the opinions of Dr. Shivers, Plaintiff's treating physician.  ECF Dkt. #9 at 13.  Plaintiff also contends that the ALJ otherwise failed to consider the factors in 20 C.F.R. § 416.927(c)(2)-(6) before affording such weight to the opinions.  *Id*.

Dr. Shivers completed disability questionnaires concerning Plaintiff on October 20, 2014 and May 15, 2015, and he followed up his last questionnaire with a letter basically restating his findings and opinions from October 20, 2014 and May 15, 2015.  ECF Dkt. #8 at 372, 393, 398.  Dr. Shivers diagnosed Plaintiff with anxiety, chronic lumbar pain and thyroid dysfunction in the questionnaires and in his letter.  *Id.*  He indicated that Plaintiff's symptoms were expected to last at least 12 months and he identified her symptoms as chronic back pain and anxiety and moderately severe daily back pain.  *Id.*  He opined that Plaintiff could sit and stand/walk for up to 2 hours each per 8-hour workday and she had to avoid continuous sitting and needed to get up and move around every 2 hours for 10 to 20 minutes at a time.  *Id*. at 391.  He further opined that Plaintiff could lift and carry 0-10 pounds occasionally and could never lift and carry more.  *Id.*  He opined that Plaintiff was moderately limited in using her left hand and arm to grasp and twist objects, perform fine manipulations and using her left arm to reach, and she was markedly limited in performing these activities with her right hand and arm.  *Id.* He opined that Plaintiff would frequently experience pain, fatigue, and other symptoms severe enough to interfere with her attention and concentration and Plaintiff's symptoms would increase if she was placed in a competitive work environment and she would experience more pain.  *Id*.  Dr. Shivers further opined that Plaintiff needed to take unscheduled breaks to rest at unpredictable intervals during the workday every one to two hours for an average of 10 to 20 minutes each time.  *Id*. Finally, Dr. Shivers opined that Plaintiff would miss

work more than three times per month due to her impairments or treatment and her anxiety contributed to the severity of her symptoms and functional limitations. *Id*. at 393.

The ALJ reviewed and addressed Dr. Shivers' opinions in his decision. ECF Dkt. #8 at 13 at 25-26. He afforded "little weight" to the opinions, explaining that Dr. Shivers provided only 5 pages of treatment records for the period beginning July 14, 2014 and back pain was mentioned only once in said records on the initial visit. *Id*. at 26. The ALJ further noted that none of the records or reports indicated that Dr. Shivers examined Plaintiff's back and no notes or records showed that Dr. Shivers referred Plaintiff to a neurosurgeon or an orthopedic specialist, or referred her to physical therapy or pain management for her back pain. *Id.*

The undersigned recommends that the Court find that the ALJ provided good reasons for attributing less than controlling weight and only "little weight" to Dr. Shivers' opinions. As Dr. Shivers and the ALJ both pointed out, Dr. Shivers began providing treatment to Plaintiff on July 14, 2014, and Dr. Shivers had examined Plaintiff on only 5 occasions. ECF Dkt. #8 at 366-367, 383-386. Dr. Shivers completed the first disability questionnaire on October 20, 2014, after only two visits with Plaintiff, the initial visit on July 14, 2014 and the other on October 16, 2014. *Id.* at 367, 368-372, 386. At the initial visit, Plaintiff explained her history of chronic back pain, but Dr. Shivers' physical examination notes failed to indicate that he examined her back and clinical findings are lacking if he perform such an examination. *Id.* at 387. Dr. Shivers' note on this date does provide other physical examination findings, but they do not mention anything related to Plaintiff's back or spine. *Id*. Dr. Shivers does provide notes on his physical examination of Plaintiff, indicating that Plaintiff was in no respiratory stress, he examined her ears, her neck, her lungs, her heart, and her abdomen, which were normal, and his examination of her extremities showed some tenderness to palpation on her right thumb. *Id*. He thereafter listed her diagnoses as including chronic lumbar back pain and he referred her for a mammogram, a colonoscopy, and to pain management. *Id*.

At the October 16, 2014 visit, Dr. Shivers notes that Plaintiff discussed her anxiety issues and she needed a refill of Valium. *Id*. at 386. Again, Dr. Shivers' physical examination notes on that date do not mention an examination or findings related to Plaintiff's back, even though he

-19-

diagnosed her with chronic lumbar pain. *Id*. Dr. Shivers physical examination note does document that Plaintiff was in no respiratory stress and he examined her ears, her neck, her lungs, her heart, and her abdomen. *Id*. He then states that Plaintiff complained of anxiety and needed her Valium refilled and she stated that she was on Lamictal but had suicidal ideations. *Id*. Dr. Shivers then noted that Plaintiff was under the care of a mental health professional and she had "[o]therwise, no further complaints." *Id*. He listed her diagnoses as including chronic lumbar back pain and he wanted her to follow up with him in three months. *Id*.

When he completed the second disability questionnaire on May 11, 2015, Dr. Shivers indicated that his most recent examination of Plaintiff was on April 20, 2015. ECF Dkt. #8 at 389. At that visit, Dr. Shivers noted that Plaintiff presented to him for a refill of her Synthroid and for a disability examination. *Id*. at 383. He noted her medications and that she was having significant problems with depression and was under the care of Dr. Kaza. *Id*. There were no complaints of back pain at this visit. *Id*. And again, Dr. Shivers noted no examination or clinical findings relating to Plaintiff's back and his physical examination notes indicate again that Plaintiff was in no respiratory stress and he examined her ears, her neck, her lungs, her heart, and her abdomen, which were normal. *Id*. at 383. In fact, his diagnoses during this visit were hypothyroidism, depression and wellness. *Id*. He opined in this treatment record that Plaintiff had problems with chronic depression and she was unable to perform full-time competitive work. *Id*.

The record shows that Plaintiff also presented to Dr. Shivers on March 17, 2015. ECF Dkt. #8 at 384. At this visit, Dr. Shivers noted that Plaintiff presented for a follow up and was status post thyroidectomy and complaining of breakthrough anxiety and depression. *Id.* No complaints of back pain were noted. *Id*. And again, Dr. Shivers' physical examination notes do not indicate that he examined Plaintiff's back as he noted only that Plaintiff was in no respiratory stress and he examined her ears, neck, lungs, heart, and abdomen, which were normal. *Id*. at 384. His diagnoses were status post thyroidectomy, chronic lumbar pain, anxiety/depression and wellness. *Id*. His plan was to perform a thyroid profile, check with Dr. Kaza concerning Plaintiff's continued anxiety, and for Plaintiff to follow up if needed. *Id*.

-20-

Plaintiff presented to Dr. Shivers on January 19, 2015 as well, and the only complaints noted were dry skin and a follow up for dyspnea. ECF Dkt. #8 at 385. Again, the physical examination notes are the same as previously noted although chronic lumbar pain was nevertheless included as a diagnosis. *Id.*

Based upon this review of the treatment records and the record in general, the undersigned finds that the ALJ provided good reasons for affording less than controlling weight and only "little weight" to Dr. Shivers' disability questionnaires and letter. None of Dr. Shivers' treatment records document lumbar examinations or clinical findings relating to Plaintiff's back or spine, even though they document Plaintiff's complaints, reasons for the visits, and other physical examination findings. Without physical examination notes or clinical findings, Dr. Shivers must have assessed Plaintiff's chronic back pain based upon her subjective claims, which, as found by the ALJ, were not fully credible. *See Keeler v. Comm'r of Soc. Sec.*, 511 Fed. App'x 472, 473 (6th Cir. 2013 (substantial evidence supported ALJ's decision to give less than controlling weight to physician opinion that appeared to be based upon the plaintiff's subjective complaints). Moreover, Plaintiff was not referred to physical therapy or to an orthopedic doctor for her back pain and she testified that Dr. Shivers told her to take Tylenol for her back pain. ECF Dkt. #8 at 53. .

Plaintiff asserts that even if the ALJ properly attributed less than controlling weight to Dr. Shivers' opinions, he failed to consider all of the factors in 20 C.F.R. §416.927(c)(2)-(6) when determining the weight to give to those opinions. ECF Dkt. #9 at 13-14. The undersigned recommends that the Court find no merit to this assertion. Plaintiff is correct that if an ALJ declines to give controlling weight to the opinion of a treating source, he must determine the weight to give that opinion based upon a number of regulatory factors found in 20 C.F.R. § 416.927(c)(2). Such factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson*, 378 F.3d at 544, citing 20 C.F.R. § 416.927(c).

However, an ALJ is not required to discuss every factor in 20 C.F.R. § 416.927(c). And in this case, the ALJ noted that Dr. Shivers was Plaintiff's primary care physician, and he noted the

length of the treatment relationship. ECF Dkt. #8 at 25. The ALJ also considered the knowledge that Dr. Shivers had regarding Plaintiff's back pain by noting that Dr. Shivers' treatment records mentioned Plaintiff's back pain only once at Plaintiff's initial visit and neither Dr. Shivers' treatment records nor other evidence, such as the MRI, supported Dr. Shivers' severe limitations for Plaintiff. *Id.* at 25-26. The ALJ noted that Dr. Shivers' treatment records lacked any evidence of a physical examination of Plaintiff's back or spine and they had no clinical findings relating to her back. The undersigned recommends that the Court find that the ALJ sufficiently considered the factors in 20 C.F.R. § 416.927(c) when determining the weight to give to Dr. Shivers' opinions.

In addition, concerning the ALJ's RFC for Plaintiff, the undersigned recommends that the Court find that substantial evidence supports the ALJ's physical RFC. In formulating his physical RFC, the ALJ properly attributed only "little weight" to Dr. Shivers' opinions due to his lack of documentation of examinations and clinical findings. ECF Dkt #8 at 25-26. The ALJ then pointed to lumbar spine scans and a MRI showing only mild to moderate findings. *Id.* at 21. He noted the findings of Dr. Sethi, the agency examining physician who documented his examination and findings which showed that Plaintiff had normal findings, but for mild tenderness at L4-5 and S1, with no muscle spasm or guarding, no positive straight-leg raising, and the ability to squat and walk on heels and toes, no use of ambulatory aids and a normal gait and normal motor and sensory examinations. *Id.* at 275. Dr. Sethi had opined that Plaintiff had normal abilities to perform work-related physical activities such as sitting, standing, walking, lifting, carrying and handling of objects. *Id.* at 22, citing ECF Dkt. #8 at 275. While Dr. Sethi found no limitations, the ALJ nevertheless attributed some credibility to Plaintiff's testimony concerning her back pain as he limited her to light work with a sit/stand option to alternate between sitting or standing for 1-2 at 30-minute intervals, and only occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling, crawling, but never climbing ladders, ropes or scaffolds. ECF Dkt. #8 at 20-21. The undersigned recommends that the Court find that this constitutes substantial evidence to support the ALJ's physical RFC for Plaintiff.

-22-

### 2.    Dr. Kaza's Opinions

Plaintiff further asserts that the ALJ erred in attributing "no great weight" to the opinions of Dr. Kaza, Plaintiff's treating psychiatrist. ECF Dkt. #9 at 10. However, as Plaintiff knows, the ALJ is not obligated to accept Dr. Kaza's opinion if he provides good reasons for not attributing controlling weight to it. Plaintiff also asserts that the ALJ failed to acknowledge or discuss any of the regulatory factors in 20 C.F.R. § 404.1527(c) after he decided not to afford controlling weight to Dr. Kaza's opinion. *Id.* at 9-10.

On August 16, 2013, Dr. Kaza completed a medical statement indicating that he first treated Plaintiff on February 1, 2013 and most recently treated her on August 16, 2013. ECF Dkt. #8 at 265. He diagnosed depressive disorder and identified supportive clinical findings of appetite disturbance with weight change, sleep disturbance, mood disturbance, recurrent panic attacks, anhedonia or pervasive loss of interests, social withdrawal or isolation, decreased energy, feelings of guilt/worthlessness, difficulty thinking or concentrating, and suicidal ideations. *Id.* at 265-266.

Dr. Kaza concluded that Plaintiff was markedly limited in: understanding, remembering, and executing detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without supervision; making simple, work-related decisions; completing a normal workweek without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers without distracting them or exhibiting behavioral extremes; being aware of normal hazards and taking appropriate precautions; traveling to unfamiliar places or using public transportation; and setting realistic goals or making plans independently. ECF Dkt. #8 at 268-271. He also opined that Plaintiff was incapable of even low work stress, her impairment would likely produce "good" and "bad" days, and she would likely be absent from work due to impairments or treatment more than three times per month. *Id.* at 271.

Dr. Kaza wrote a letter on June 19, 2015 indicating that his treatment of Plaintiff since February 1, 2013 for her depressive disorder and he identified his clinical findings for such a

-23-

diagnosis. ECF Dkt. #8 at 400.  He opined that Plaintiff was markedly limited in: understanding, remembering, and executing detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without supervision; making simple, work-related decisions; completing a normal workweek without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers without distracting them or exhibiting behavioral extremes; being aware of normal hazards and taking appropriate precautions; traveling to unfamiliar places or using public transportation; and setting realistic goals or making plans independently. ECF Dkt. #8 at 400.  He further indicated that Plaintiff was not a malingerer, she was incapable of even low work stress, her impairment would likely produce "good" and "bad" days, and she would likely be absent from work due to impairments or treatment more than three times per month.  *Id.*

In affording less than controlling weight and in fact "no great weight" to Dr. Kaza's opinions, the ALJ reviewed Dr. Kaza's treatment records and his opinions and found his marked limitations at odds with his findings in his evaluations that Plaintiff had only moderate impairments. ECF Dkt. #8 at 25.  The ALJ also noted Dr. Kaza's findings that Plaintiff had shown some improvement and he found that Dr. Kaza's notes and evaluations failed to support his severe restrictions for Plaintiff.  *Id.*  The ALJ also indicated that the issue of disability was one reserved to the Commissioner.  *Id.*       The undersigned recommends that the Court find that while the ALJ could have provided a more thorough analysis of Dr. Kaza's opinions, his reasons for attributing less than controlling weight to the opinion were adequate to meet the treating physician rule.  The ALJ properly found that the decision on the issue of whether a claimant is disabled is reserved for the Commissioner and no special significance is given to treating source opinions on this issue.  *See* 20 C.F.R. § 416.927(d)(1).  The ALJ also reasoned that Dr. Kaza's treatment notes failed to support his severe restrictions for Plaintiff.  While he did not go into great detail in that part of his decision, the ALJ noted earlier in his decision that Dr. Kaza assigned Plaintiff a global assessment of functioning rating of 55 at her initial assessment, which indicated only moderate symptoms.  *Id.* at 23, 25.  The

-24-

ALJ also noted that Dr. Kaza had reported that the intensity of Plaintiff's symptoms was only moderate in his April 2015 assessment. *Id*. at 24, citing *Id.* at 381. Notes accompanying that assessment also show that while Plaintiff had a flat affect, depressed and irritable mood and was preoccupied and guarded, Plaintiff had good insight and judgment, was pleasant and cooperative, and she reported no hallucinations or aggression, and had logical thought processes. *Id*. at 378-379. Thus, while the ALJ lacked detail in the paragraph addressing the weight that he attributed to Dr. Kaza's opinion, the ALJ's decision as a whole adequately elaborates on the ALJ's good reasons for attributing less than controlling weight to the opinion, for affording the opinion that weight that he did, and for finding Dr. Kaza's severe limitations to be unpersuasive. The indications of moderate symptoms noted in Dr. Kaza's treatment records, coupled with the lack of significant findings to support the severe restrictions that he opined for Plaintiff, adequately supports the ALJ's decision to attribute less than controlling weight an in fact "no great weight" to Dr. Kaza's opinions.

Additionally, the ALJ also adequately considered the factors of 20 C.F.R. § 416.927(c) in his decision to attribute "no great weight" to Dr. Kaza's opinions. The ALJ noted that Dr. Kaza was Plaintiff's treating psychiatrist and he had been treating Plaintiff since January 18, 2013. ECF Dkt. #8 at 23. The ALJ cited to Dr. Kaza's clinical findings in his evaluations and he explained that they did not support his severe restrictions for Plaintiff. *Id.* In particular, he cited to Dr. Kaza's moderate GAF and moderate intensity of symptoms when evaluating Plaintiff and he concluded that these findings, and findings showing improvement in Plaintiff's symptoms, failed to support Dr. Kaza's severe restrictions. *Id.*

For these reasons, the undersigned recommends that the ALJ adequately complied with the treating physician rule and 20 C.F.R. § 416.927(c) in attributing less than controlling and in fact attributing no "great weight" to Dr. Kaza's opinions.

As far as the mental RFC that the ALJ determined for Plaintiff, the undersigned recommends that the Court find that substantial evidence supports that determination. The ALJ limited Plaintiff to simple, routine and repetitive tasks requiring only simple decisions, no fast-paced production requirements, few workplace changes, and no more than occasional interaction with the public, co-workers and supervisors. ECF Dkt. #8 at 21. He based this mental RFC on the limitations opined

by the agency reviewing consultants, the treatment records, and Dr. Kaza's findings of moderate limitations and his statement of Plaintiff's improvement in her conditions. *Id.* The state reviewing mental health professionals found, based upon the record evidence, that Plaintiff had moderate limitations in social functioning and in maintaining concentration, persistence or pace. ECF Dkt. #8 at 69-73, 82-88. They found that Plaintiff could perform 1-4 step tasks and had reduced concentration and stress and while she had a markedly reduced capacity for public interactions and would work best in small groups, she could sustain tasks as long as the interactions involved only occasional and superficial interactions with others and could not work in situations where she would have to resolve conflicts or maintain a friendly and persuasive demeanor. *Id.* For these reasons, the undersigned recommends that the Court find that substantial evidence supports the ALJ's mental RFC for Plaintiff.

## B.    CREDIBILITY

Plaintiff also challenges the ALJ's determination of her credibility. ECF Dkt. #9 at 16-18. She asserts that substantial evidence does not support his decision to discount her credibility as he provided only "boilerplate language" for this determination and he erroneously relied upon her lack of treatment and narcotics  for her back pain and her lack of ongoing treatment and notes of improvement in her mental conditions in discounting her credibility. *Id.*

The social security regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 416.929, SSR 96–7p, (superseded by SSR 16-3p, effective March 28, 2016). In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir.1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038–1039 (6th Cir.1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental

-26-

impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96–7p. *See* SSR 96–7p, These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039–40.

Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at 1234. The Court is limited to "evaluating whether or not the ALJ's explanations for partially discrediting" a claimant "are reasonable and supported by substantial evidence in the record. *Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. App'x 162, 173, quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-476 (6th Cir.1997)(citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)(citing *Kirk*, 667 F.2d at 538)). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir.2005).

Here, the ALJ discounted Plaintiff's complaints of disabling back pain, noting that Dr. Shivers failed to document that he examined Plaintiff's back and he failed to note any clinical findings  relating thereto. ECF Dkt. #8 at 21-25.  The ALJ relied upon the objective medical evidence of MRI results and CT scans which showed only mild to moderate DDD and he relied upon Dr. Sethi's documented physical examination that showed relatively normal results but for some tenderness in the back.  *Id.; see Curler v. Comm'r of Soc. Sec.*, 561 Fed. App'x 464, 473 (6th Cir.

-27-

2014)("Had Curler suffered from severe pain associated with her back condition, the medical records would have revealed back or leg abnormalities, abnormal functioning on physical exams, recommendations for more aggressive treatment, and more significant doctor-recommended functional limitations."). The ALJ also noted that Plaintiff took no medications beyond Tylenol for her back pain at her doctor's direction and she was not referred for physical therapy or additional medical treatment or evaluation for her back pain. ECF Dkt. #8 at 24-25.

As to Plaintiff's mental impairments, the parties dispute whether the ALJ should have inquired further into gaps in Plaintiff's mental health treatment, which the ALJ partially relied upon in making his credibility determination relating to her mental impairments. ECF Dkt. #9 at 17; ECF Dkt. # 15-16. Plaintiff suggests the possibility that she did not consistently receive mental health treatment due to the lack of financial ability and asserts that the ALJ should have inquired into the reasons why she failed to consistently pursue treatment. ECF Dkt. #9 at 17-18. Defendant counters that the burden is on Plaintiff to establish disability and the ALJ was under no obligation to question Plaintiff as to why she did not consistently receive treatment. ECF Dkt. #10 at 15-16.

Regardless of whether the ALJ should have inquired further into Plaintiff's gaps in mental health treatment, the undersigned recommends that the Court find that substantial evidence supports the ALJ's discounting of Plaintiff's credibility relating to the severity and limiting nature of her mental health impairment. The ALJ should have provided more detail as to his credibility determination on this issue. However, substantial evidence requires only a scintilla of evidence to support the ALJ's determination. Such evidence exists here.

Besides the gaps in treatment, the ALJ presented other reasons to support his decision. He indicated that, although Dr. Kaza opined that Plaintiff's mental impairments were severely limiting, the doctor's progress notes did not support his severe limitations, as Dr. Kaza found that Plaintiff's symptoms of mental health impairment were only moderately limiting and her GAF was 55, indicative of moderate symptoms. ECF Dkt. #8 at 19. Dr. Kaza also found on numerous occasions that Plaintiff presented with good insight and judgment. *Id*. The ALJ also noted that Dr. Kaza reported that the medications that Plaintiff was taking were improving her symptoms. *Id*. Moreover, the ALJ noted that Plaintiff took care of her minor daughter and in fact, Plaintiff testified

-28-

that she did not look for work since giving birth to her daughter and did not return to work because she was all that her daughter had and she was raising her daughter.  ECF Dkt. #8 at 19; ECF Dkt. #8 at 43-44, 182, 307.  The undersigned recommends that the Court find that the reasons presented by the ALJ in his credibility determination concerning Plaintiff's mental health impairments are sufficient and supported by the record and constitute substantial evidence for his determination.

**VIII.**  **CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.


Date: December 22, 2017                     */s/George J. Limbert*
                                            GEORGE J. LIMBERT
                                            UNITED STATES MAGISTRATE JUDGE